

United States District Court
Western District of Washington
At      Seattle

FILED
LODGED
RECEIVED  **MAIL**

SEP 2⬤ 2022

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

Jason "J. Lee" Sutton,
aka: "Jennifer Lee" Sutton,
Pro se Petitioner,

vs.

Paula Chandler,
Superintendent,
Leslie E. O'Connor,
WSR A Unit Manager,
Maria Angel,
Investigator,
James Davis,
Corrections Sgt.,
David Brown,
Officer,
Ben Balyeat,
Officer, all sued in
their individual and
Official Capacities,
Defendants.

NO.

**22-CV-1392 BHS-MLP**

Civil Rights Complaint,
Pursuant to Title 42
U.S.C. § 1983.

Demand for Jury Trial.

Federal Question.

Complaint for Money
Damages, and
Injunctive Relief.

(Clerk's Action Required).

Civil Rights Complaint - pg. 01.

# I.    Introduction

COMES NOW pro se plaintiff, Jason "J.Lee" Sutton, aka: "Jennifer Lee" Sutton, a male-to-female Transgender prisoner, currently incarcerated at Monroe Corrections-Complex (MCC) Segregation Unit, With the filing of her Civil Rights Complaint Under Title 42 U.S.C. § 1983. Plaintiff has Sufficient evidence under CR#11, and Fed. R. Civ. P. 11 warranting the filing of this civil action. This action is brought in good faith. This case deals with allegations of animal abuse, and some deitails may be difficult to read.

# II.    Jurisdiction and Venue.

2.01    Plaintiff brings this lawsuit, pursuant to Title 42 U.S.C. § 1983. This Court has Jurisdiction Under Title 28 U.S.C. § 1331 and 1343. Plaintiff also seeks a declaratory judgment pursuant to Title 28 U.S.C. § 2201.

2.02    This Court has Supplemental Jurisdiction over plaintiff's State-law claims (if any) under Title 28 U.S.C. § 1367.

Civil Rights Complaint - pg. 02.

2.03  This U.S. District Court (at Seattle), is an appropriate venue, under Title 28 U.S.C. § 1391 (b)(2), because a substantial part of the events, or omissions giving rise to the below claims, happened within this judicial district.

## III.  Parties Involved

3.01  Plaintiff, "Ms. J. Lee Sutton," was at all times relevant to this action, a prisoner confined at the Monroe Corrections Complex (MCC) either at the Main Reformatory Unit, or housed in the Segregation Unit. This prison facility is located within the Western District of Washington.

3.02  Defendant, Paula Chandler, was at all times relevant to this action, the Associate Superintendent and Superintendent of the Monroe Corrections Complex (MCC) at the Twin Rivers Unit (TRU). Ms. Chandler is responsible for reviewing disciplinary infraction appeals, submitted to her by prisoners (like plaintiff), who were found guilty of violating prison rules under the Washington-Administrative Code (WAC rules). Ms. Chandler is also responsible for ensuring the safety and well-being of prisoners under her supervision.

Civil Rights Complaint — Pg. 03.

3.03  By Statute, RCW 72.09.015, defendant Chandler is responsible for her actions in allowing plaintiff to remain in "long-term" solitary-confinement (Restrictive Housing), when she was made aware that there existed "Exculpatory Evidence," revealing the innocence of plaintiff; yet Ms. Chandler denied plaintiff her request for a new infraction hearing.

3.04  By D.O.C. prison policy, a prisoner (like plaintiff), is not to be confined within the Segregation Unit, unless corroborated evidence shows that it is needed "on a temporary basis."

3.05  By defendant Chandler denying Sutton's request for a new infraction hearing (when a new hearing was warranted) this caused Sutton to remain in long-term isolation, contrary to D.O.C. policy, and Sutton has remained in Segregation from May 17, 2022, until the filing of this complaint, and beyond.

3.06  Due to defendant Chandler's actions, plaintiff has suffered damages. Ms. Chandler is sued in her individual/official capacities.

Civil Rights Complaint — pg. 04.

3.07  Defendant Leslie E. O'Connor, was at all times relevant to this action, the Unit-Manager, or Unit-Supervisor of the Main Reformatory's A-Unit, also Known as WSRU-A-Unit. During all relevant times mentioned below, Ms. O'Connor was responsible for the day-to-day management, safety and well-being of the prisoners housed in A-Unit (like plaintiff).

3.08  Defendant O'Connor — as "A-Unit's Manager" — had the authority to infract a prisoner (like Sutton), if she had "Corroborated evidence" that Ms. Sutton — or any prisoner — had indeed acted in a way Consistent with violating a prison rule, or the WAC rules, etc..

3.09  D.O.C. Policy, and D.O.C. C.O.R.E. Training materials, do not Support defendant O'Connor's actions in drafting an infraction against Sutton, When that infraction is based upon "2 nd hand-information," also when O'Connor did not directly witness the Conduct at issue.

3.10  Defendant O'Connor has been trained in how to draft infraction reports Correctly, yet O'Connor did not do so in this case.

Civil Rights Complaint — pg. 05.



3.11   Defendant O'Connor's infraction report stated that it was "Consistent with the Supplemental incident reports," when she had knowledge - previous to the report being drafted - that these "incident reports" did not support her narrative of the events which allegedly happened on "May 17, 2022."

3.12   Defendant O'Connor thereby violated D.O.C. policy, and her training when she created a fabricated narrative against Sutton, with the intention to cause Sutton numerous forms of physical, and psychological harm.

3.13   Defendant O'Connor's actions in this case were done wantonly, maliciously, and willfully. O'Connor's actions have caused Sutton damages. Defendant O'Connor is sued in her individual, and official capacities.

3.14   Defendant Maria Angel, was at all times relevant to this action, the MCC Intelligence, and Investigations Chief at the Monroe prison. During all times mentioned below, Ms. Angel supervised the prison investigation into the alleged incident.

Civil Rights Complaint - pg. 06.

3.15   On May 17, 2022, in the afternoon hours, defendant Angel was called to investigate the allegations that plaintiff (along with inmate Julian Eren #399273), had harmed an animal on the WSRU Main yard. Defendant Angel then called law enforcement, and an officer from the Monroe Police Dept. arrived.

3.16   During the police investigation, MS. Angel had in her possession copies of D.O.C. Supplemental incident reports, which revealed contradictory and inconsistent narratives — drafted by a few defendants — which tended to refute the allegations made against Sutton and Eren.

3.17   Defendant Angel also had knowledge that the Monroe police officer found a "lack of corroborating evidence" tending to Show that both Sutton and Eren were, and are innocent.

3.18   Yet, defendant Angel did not provide this "Exculpatory Evidence" to the Major Hearings Officer, and this information was not shared with Sutton, or Eren.

Civil Rights Complaint — pg. 07.

3.19    As the Chief investigator, defendant Angel had the authority to provide copies of "all exculpatory evidence" over to the major hearings office, and by D.O.C. policy these supplemental reports should have been attached to any infraction filed against Sutton, and Eren, however they were not. See, D.O.C. policy No. 460.000 Directive. IV. C..

3.20    Defendant Angel withheld this favorable evidence from both Sutton, and Eren without a justified reason, contrary to plaintiff's rights under "due process of law." If this favorable evidence had been shared with Sutton, or the major hearings office, it may have changed the outcome of the hearing held on May 31st, 2022.

3.21    Defendant Angel's actions have caused both, Sutton and Eren to be found guilty at a major infraction hearing, because the favorable evidence was withheld from them both without justification.

Civil Rights Complaint— pg. 08.

3.23   This guilty ruling at the May 31st 2022 hearing has caused numerous forms of sanctioned punishment upon Sutton. See, Infraction Group Number (IGN) #69 within Sutton's D.O.C. records.

3.24   Due to defendant Angel's actions, plaintiff has suffered damages. Ms. Angel is sued in her individual and official capacities.

3.25   Defendant James Davis, was at all times relevant to this action, the WSRU Zone Sgt. supervising D.O.C. employees, and prisoners in and around the prison yard, and Gate #7 Industries area.

3.26   Defendant Davis had previous interactions with plaintiff whereby Davis directed plaintiff to "put the rabbits down," and "do not pick them up." Plaintiff complied with these directives and then discussed the matter with WSRU Captain Ms. Inia McNeese.

Civil Rights Complaint — pg. 09.

3.27   After Sutton took the matter to defendant Davis, supervisor, Davis then advised plaintiff that McNeese stated Sutton had permission to "pick-up the rabbits, and hold them while petting them."

3.28   A few days later, on May 17, 2022, defendant Davis filed a supplemental incident report, where he made "false statements" that plaintiff had physically harmed a bunny rabbit, which subsequently caused plaintiff to be infracted.

3.29   Plaintiff, and her friend Julian Eren #399273, were also placed into segregation.

3.30   Defendant Davis report makes clear, that he brought the rabbit to the shift office, and photos of the animal were taken. These photos were taken on May 17, 2022, during the Monroe police investigation.

3.31   The Monroe police officer stated he saw "no injuries to the animal," and that the animal was "healthy," yet defendant Davis claimed the animal was harmed.

Civil Rights Complaint- pg. 10.

3.32   By defendant Davis making false, or misleading statements to defendant O'Connor intending for O'Connor to have plaintiff and Erem infracted for "harming an animal," when Davis knew the animal suffered no harm at all, has caused plaintiff to suffer damages.

3.33   Upon information and belief there exists evidence between defendants and Davis that the animal suffered no harm, yet defendants took no action to have O'Connor cease drafting the infraction report against plaintiff, and Erem.

3.34   Defendant Davis took no action to correct, or amend his supplemental report, after he was made aware that the animal was not harmed in any way. Instead, Davis doubled-down, and added to his report, when he responded to Sutton's request for a witness statement.

3.35   Defendant Davis was not a direct witness to the alleged incident of May 17, 2022.

Civil Rights Complaint - pg. 11.

3.36  Defendant Davis intent is clear. Davis had time to correct the records in this case, yet he decided not to. This led to Sutton being found guilty at the infraction hearing held on May 31st 2022.

3.37  Davis's actions in this case were done wantonly, maliciously, and willfully. These actions have caused Sutton damages. Defendant Davis is sued in his individual, and official capacities.

3.38  Defendant David Brown, was at all times relevant to this action, the WSRU Gate #7 officer, and his post is on the Southwest side of the prison yard, near the location of the alleged incident at issue.

3.39  Upon information and belief, there exists evidence that defendant Brown had been previously monitoring the Plaintiff and had previously alleged that Sutton had harmed a rabbit on the prison yard, by "violently picking it up." Even though, no other Corrections officer, or D.O.C. employee had ever witnessed Sutton harm an animal previous to May 16th–17th, 2022.

Civil Rights Complaint – pg. 12.

3.40    Defendant Brown entered a previous report dated "5·16·22" into a P.O.C. database, yet this report did not get submitted to Defendant Sgt. Davis, until 5-17-22, the day of the alleged incident.

3.41    Defendant Brown then entered another report dated 5-17-22 (on top of his 5·16·22 report), where he states he witnessed this same rabbit being mistreated by Sutton.

3.42    Defendant Brown is the first reported "direct witness" to the alleged abuse of this animal. Yet another defendant (Mr. Balyeat) states he was a "direct witness" to the alleged incident, and in Balyeat's report he only states that Sutton was "holding and moving a rabbit." Both Balyeat and David Brown were watching the same animal interacting with Sutton and Eren, yet we have two completely different stories.

3.43    Defendant Brown is the first person to allege that Sutton harmed this animal, yet we now know, the animal did not suffer any harm whatsoever.

Civil Rights Complaint – pg. 13.

3.44    Defendant Brown promoted, and advocated for the animal abuse allegation, when there existed no evidence of harm to this bunny rabbit. Defendant Brown then worked to convince defendant Sgt. Davis that abuse did take place, which caused Sgt. Davis to believe it was true.

3.45    Again, defendant Sgt. Davis was not a direct witness to this alleged incident, and took - at face value - the statements made by Mr. Brown to be true, without an appropriate investigation.

3.46    By defendant Brown making the implication that Sutton had harmed a bunny rabbit, when he himself had no corroboration to prove this implication to be true, caused Sutton to be infracted, and eventually found guilty at an infraction hearing held on May 31st 2022.

3.47    Defendant Brown's actions were done wantonly, maliciously, and willfully. Defendant Brown's actions have caused Sutton damages. Defendant Brown is sued in his individual, and official capacities.

///

///

Civil Rights Complaint - pg. 14.

3.48  Defendant <u>Ben Balyeat</u>, was at all times relevant to this action, the <u>WSRU Tower-One officer</u> - on day shift - and his post is located on the Northeast corner of the prison yard, approx. 500 feet from the Southwest corner of the yard, where the alleged incident took place.

3.49  As stated in <u>paragraph #3.42</u> above, defendant Balyeat's Supplemental "<u>initial</u>" incident report, only mentions that the animal was "<u>being held and moved</u>" by Sutton, not that Sutton had been seen doing any harm to it.

3.50  As soon as the <u>Monroe police officer</u> left the prison facility, and had concluded its independent investigation, all of a sudden Balyeat's narrative began to be changed.

3.51  According to defendant O'Connor, <u>Balyeat informed her</u> that Sutton and Eren had committed an act that constituted Animal Cruelty in the First degree, under <u>RCW 16.52.205(3)</u>, with a sexual motive.

3.52  Defendant Balyeat's "<u>2nd report</u>" to defendant O'Connor, doesn't match his initial report to law enforcement, and isn't consistent with the other defendants' reports.

Civil Rights Complaint - pg. 15.

3.53  Upon information and belief, plaintiff asserts that there exists evidence that Balyeat was in communication with other defendants, and during these discussions it was agreed upon, that the narrative would be changed, and that plaintiff and inmate Eren would be infracted, based upon a fabricated narrative which was/is not supported by any physical, or forensic evidence.

3.54  Defendant Balyeat had the means, motive, and opportunity to charge both plaintiff and Eren with animal abuse, when he had previous knowledge that the bunny rabbit had not been harmed.

3.55  Defendant Balyeat's actions were done wantonly, maliciously, and willfully. Defendant Balyeat's actions have caused Sutton to suffer damages. Defendant Balyeat is sued in his individual and official capacities.

3.56  All defendants (above), worked in concert with each other, to deprive Ms. Sutton of her constitutional rights, without a penological justification.

Civil Rights Complaint — pg. 16.

## IV. Exhaustion of All Administrative Remedies

4.01 On _May 18th, 2022_, plaintiff filed her D.O.C. complaint alleging D.O.C. employee misconduct regarding this case. See, grievance log i.d. # _22756279_. See, Attachment No. one. (copy of records).

4.02 Plaintiff's complaint was not investigated, and D.O.C. provided no relief.

4.03 On _May 31st 2022_, plaintiff was found guilty at an infraction hearing. See, Sutton's records under _IGN # 69_. On _June 1st, 2022_, Sutton submitted her appeal to MCC Superintendent Jack Warner.

4.04 Plaintiff's appeal was assigned to defendant Paula Chandler. On _June 13th, 2022_, Ms. Chandler upheld the guilty ruling, stating: "_no new evidence was presented during your appeal._" See, Attachment No. Two. (copy of appeal decision).

4.05 On _Aug. 14, 2022_, plaintiff submitted her updated appeal, due to becoming aware of "Exculpatory Evidence." This 2nd appeal was not processed, but denied without a fair review. See, Attachment No. Three.

Civil Rights Complaint - pg. 17.

4.06  Plaintiff has also submitted kites (inmate request slips) to defendant Chandler, seeking a new infraction hearing, yet MS. Chandler has denied Sutton's request.

4.07  Thereby, plaintiff has exhausted all remedies made available to her, without defendants providing relief, and this has caused this civil action to be filed against all defendants.

## V.  Factual Allegations

5.01  Plaintiff is a male-to-female Transgender individual, who has been imprisoned since 1994, approx. "28 years", under custody of Washington State Dept. of Corrections (D.O.C.).

5.02  From October 2019 - May 17, 2022, MS. Sutton was housed at the Monroe Corrections Complex (MCC) Main Reformatory Unit (WSRU), and from May 17, 2022 till the filing of this Complaint MS. Sutton has remained in Segregation - long term Solitary Confinement.

5.03  This Case deals with allegations of animal abuse, an unfair infraction hearing, exculpatory evidence located "after" the hearing, and eventual appeal, and the denial of a requested new hearing.

Civil Rights Complaint - pg. 18.

5.04   Plaintiff has consistently denied harming this animal, and desired to present evidence tending to show her innocence, yet her repeated request for a new infraction hearing has been denied.

### The History of "bunny rabbits" at Monroe Corrections Complex (WSRU)

5.05   From the Spring/summer of 2020 until todays date, WSRU facility employees, and prisoners have witnessed "domestic-type" bunny rabbits migrating into, and all around the facility recreation yard, and internal industries area.

5.06   During the end of 2020 up until May 17, 2022, Ms. Sutton began to feed and care for these animals.   Human forms of food were served to them, Consisting of carrots, lettuce, cabbage, and some oats, bread, and bran-bars, etc.. This kind act, became a form of therapy for Sutton, because Sutton hadn't interacted with any animals for many years, and this interaction was a joy to experience within the confines of a prison.

5.07   After the first few weeks of being fed by Sutton and other prisoners, these rabbits began to depend upon the prisoners for a reliable and Consistent food source.  It became common for prisoners to care for the rabbits, and this simple act of kindness, became a form of therapy for many prisoners at WSRU.

Civil Rights Complaint – pg. 19.

5.08   Towards the end of 2020 and into 2021, defendant Balyeat made it known — via yard P.A. System — that he was opposed to the interactions between prisoners, and rabbits. Defendant Balyeat would often speak very loudly over the P.A. System, and regularly direct plaintiff to "put the rabbit down," also "Do it now, step away from it!"

5.09   Plaintiff consistently complied with these directives, even though the rabbits hadn't been harming Sutton, and she hadn't been doing any harm to them.

5.10   During this same time, there were many other prisoners "picking-up, and holding rabbits," while petting them, yet these other prisoners were not directed to put them down, etc.

5.11   Plaintiff began to feel as if she was being targetted, and singled-out for mistreatment by defendant Balyeat. To Sutton's knowledge, prisoner Julian Tarver #885530, was a witness to defendant Balyeat's behavior.

5.12   Also, prisoner Julian Eren #399273, became a witness to Balyeat's actions before, and during the alleged incident at issue (below).

5.13   Plaintiff will be seeking a witness statement from both prisoners (above), in support of this lawsuit.


Civil Rights Complaint — pg. 20.

5.14    From the later-part of 2020 until the Spring/Summer of 2022, there existed a debate between D.O.C. employees at WSRU, and prisoners concerning whether or not prisoners were allowed to "pick-up," "hold," or "pet the rabbits."

5.15    These debates ultimately led to Confusion, as some prisoners believed they could continue this practice, while others had a different opinion on the matter.

5.16    Until Ms. Sutton was given a direct order to discontinue this practice, Sutton intended to continue her care for the rabbits, because she was good at it, and it brought her much comfort and joy.

5.17    In the later part of 2021, Sutton was (once again) in the WSRU yard, caring for and observing the behaviors of multiple rabbits, more specifically a white/black spotted rabbit named "Junior." See, _Exhibit No. One._ (photo of Sutton, and Junior).

5.18    From 2021-2022, Sutton had been "domesticating" Junior, and her actions became quite popular at WSRU. Sutton was witnessed caring for Junior by multiple state employees, and numerous prisoners.

Civil Rights Complaint— pg. 21.

5.19   For (at least) 2 years, Sutton had been caring for the rabbits on the prison yard, and had not been seen mistreating any of them, until the allegations reported on 5.16.22 and 5.17.22.

5.20   Sutton was known to exhibit great care, and concern over Juniors health, and Sutton was very dedicated to this task. See, Exhibit No. TWO. ( McNeese Statement).

5.21   Again, From January 2022 until May 17, 2022, defendant Balyeat hadn't been observed or overheard by Sutton directing "other prisoners" to " put the rabbit(s) down," yet Balyeat made a direct effort to target Sutton with these illogical directives.

5.22   This naturally became very concerning to Sutton, as it became fairly evident that she was being targeted by Balyeat For mistreatment, and arbitrary actions by D.O.C. employees

5.23   Plaintiff Felt it was necessary to make verbal complaints to defendant Sgt. James Davis, and WSRU Captain Ms. Ina McNeese. These are Balyeat's direct supervisors.

5.24   From the later part of January 2022 till May 17, 2022, Sutton discussed her concerns with Ms. McNeese, and these conversations took place at the WSRU yard fenceline.

Civil Rights Complaint - pg. 22.

5.25  These Conversations, led to ms. McNeese "granting" me the permission needed to "hold and pet" the bunny rabbits. See, *Exhibit No. TWO*, and *Exhibit No. TWO(a)*. (Permission Confirmed).

5.26  With this permission, the targeted harassment by Belyeat Should have ended. It unfortunately did not.

5.27  Sutton did not know it — at that time — that another officer had been watching her interact with the rabbits, and had concerns with the way in which Sutton was doing it. It wasn't until 5.17.22, that this same officer Filed a Supplemental report detailing his "Secret" concerns. See, *Exhibit No. TWO(a)*. (defendant Brown's report).

5.28  Defendant Brown, did not discuss his concerns with Sutton, and Sutton had no knowledge that these concerns had existed before the incident of 5.17.22.

### Plaintiff Was Commended on Caring for the Rabbits

5.29  Between March 2022 to may 17, 2022, Sutton was commended on her historical work in caring for the rabbits, by officer mr. "Burnam," or "Burnum," (Spelling unknown), who also shared with Sutton helpful information.

5.30  This officer stated he knew of an officer who wanted to adopt a rabbit for this officer's Daughter, for the 2022 Easter holidays. Sutton was told that the identity of this officer was ms. Danielle Briscoe.

5.31  Plaintiff soon thereafter met with Briscoe, and it was agreed that Briscoe would "adopt" Junior, and take Junior home to her Daughter. However, Briscoe needed permission from Captain McNeese first.

5.32  Plaintiff then planned on having Junior "cleaned" on the yard, before Junior was to be taken home with Briscoe, in order to prevent the officer from taking home a dirty rabbit, that was covered in fecal matter, and male rabbit urine.

5.33  Officer Briscoe then went on Vacation, and was not at WSRU when the below incident allegedly took place.

Sutton Then Had A
Meeting With Defendant
Sgt. DJames Davis

5.34  A day or two before May 17, 2022, Sutton was directed to walk over to the WSRU Yard Fenceline, near Gate #7, Southwest Corner of the prison yard. Defendant Davis had requested this meeting.

Civil Rights Complaint — pg. 24.

5.35  During this meeting, Sgt. Davis told Sutton that she now had permission from Captain McNeese to "hold and pet" the rabbits.

5.36  It was at this time, that Sutton shared with defendant Davis that defendant Balyeat had been consistently harrassing her, and targetting her, regarding her actions in "holding and petting" the rabbits.

5.37  Plaintiff requested that Sgt. Davis direct Balyeat to stop his behaviors, since McNeese had given Sutton permission.

5.38  Defendant Davis left the meeting, with the implication that he would speak to Balyeat over this matter.

5.39  Immediately after this meeting, the below events unfolded at WSRU.

The "May 17th, 2022" Incident

5.40  On May 17, 2022, Sutton and her friend "Julian Eren #399273, proceeded to the WSRU recreation yard at approx. 12:45pm.

5.41  Mr. Eren had agreed to help Sutton clean the rabbit "Junior," in order to prepare it for eventual adoption by Briscoe.

Civil Rights Complaint — pg. 25.

5.42   At that time, neither Sutton or Eren were aware that Balyeat was working inside WSRU Tower #one, or that he began to watch them both as soon as they entered the yard.

5.43   According to defendant Brown, at 1:00pm he witnessed (in part): "Inmate Sutton had the white/yellow bunny forced on its back, and was physically holding it down." See, Exhibit No. Two (a). (Brown's report, along with multiple officers reports). None of these reports mention anything about "penetration" of the rabbit.

5.44   According to defendant Balyeat, when he submitted his "initial" report, all he said was that he witnessed: "Sutton and Eren handling and physically moving a wild rabbit." See, Exhibit No. Two (a). (Balyeat's report). This report also did not mention "penetration."

5.45   However, once defendant O'Connor got involved, all of a sudden the narrative began to be changed. The change in the narrative will be shared below.

WSRU Intelligence and an Investigator was called

5.46   Defendant Maria Angel was contacted about this matter, and began her investigation.

Civil Rights Complaint— pg. 26.

5.47   Soon after defendant Angel became aware of the allegations, She Contacted the City of Monroe Police Department.

5.48   During the time defendant Angel, and a Monroe police officer were investigating, Plaintiff and Eren were escorted off of the yard, and directed to return to their assigned cells within WSRU A Unit.

5.49   Within 30 minutes after being "celled-in" both Sutton and Eren were restrained and escorted into the Segregation Unit, also known as "Imu," or Restrictive Housing Unit.

5.50   Sutton and Eren were not told why they were being housed into Segregation, and it wasn't until the evening of 5.17.22 that a Monroe police officer told them what the allegations were. See, Exhibit No. Three, and Exhibit No. 4. (Infraction report by O'Connor, and police report #2022-7948.)

Civil Rights Complaint— pg. 27.

5.51  During the interview between Sutton, and the Monroe police officer, defendant Angel was present in the Segregation hallway, when Sutton was told what the allegations were.  At this time, defendant Angel was in possession of numerous inconsistent and contradictory D.O.C. Supplemental incident reports.

5.52  Defendant Angel, also was made aware of the determination made by the police officer, that: "the animal appeared healthy." "I did not notice any blood, missing patches of fur, or other obvious signs of harm." "There is not enough evidence to show the rabbit was molested, or mistreated in any way." See, Exhibit No. 4. (police report).

5.53  Between 5-17-22 until 5-25-82, defendant Angel had enough time to make a recommendation to WSRU Superintendant John Padilla, or Jack Warner, that there is "no harm to the rabbit" and that both Sutton and Eren Should not be infracted, and should be released from Segregation.

Civil Rights Complaint - pg. 28.

5.54   Defendant Angel did not make this decision, and allowed Sutton and Eren to remain in, and languish in Segregation. Defendant Angel had the authority to prevent the below events from unfolding, yet Angel took no action.

5.55   From 5.17.22 until 5.23.22, Sutton and Eren remained in Segregation. Then, on 5.23.22 defendant O'Connor drafted an infraction report against Sutton, and Eren, and WSRU Major hearings office received it on 5.24.22. See, Exhibit No. Three.

The Major Infraction
Report by O'Connor

5.56   On 5.25.22, Sutton and Eren were served an infraction, with allegations that they both violated a "W.A.C. #507," a class "A" infraction, defined as: "Committing an act that Would Constitute a felony, and that is not otherwise included in these rules." The felony alleged to have been committed is: "Animal Cruelty" (in the First degree) under RCW 16.52.205 (3).

Civil Rights Complaint – pg. 29.

5.57   According to defendant O'Connor, Balyeat stated to her, that:

"Sutton and Eren placed a rabbit on its back (on a table), pinned it down – while Sutton wore gloves – Sutton inserted multiple fingers inside the rabbits anus – anal cavity."

See, Exhibit No. Three. (report).

5.58   Defendant O'Connor stated in this report that: "The behaviors are consistent with the incident reports." At the time Sutton was served this infraction, the "Supplemental incident reports" were not served on Sutton, and were not made a part of the "infraction packet." This is a Violation of D.O.C. Policy No. 460.000 Directive IV.C..

5.59   If Sutton had been served a copy of these reports, she would have used them in her defense at the below hearing. Without them, the hearing's process was not fair, and a violation of due process.

Civil Rights Complaint – pg. 30.

5.60  The "Supplemental incident reports" drafted by "9" D.O.C. employees, refute O'Connor's report, and reveal that there was "no penetration of the rabbit." See, Exhibit No. Two(a). Maybe this is why defendant Angel, defendant O'Connor, and other defendants did not want Sutton or Eren to obtain them before their hearings.

The May 31st 2022
Major Infraction Hearing

5.61  At the hearing held on 5·31·22, Sutton pled "Not Guilty," and presented the best defense she could, "without the benefit of the above Supplemental reports."

5.62  The only evidence presented by the department against Sutton was the Following:
A. Report by O'Conner with 2nd hand information allegedly supplied by Balyeat, and
B. No "Supplemental reports" present at the hearing, when they should have been, and
C. Photos taken of the rabbit showing "no injuries at all," also

Civil Rights Complaint- pg. 31.

D.   Video Surviellance recording, which was determined to be "unremarkable" without an explanation as to what this meant. See, Suttons records under IGN #69. Also See, Exhibit No. 3 (a). (hearing's officer decision).

5.63   At the end of the hearing, Sutton was found "guilty" based upon:

"Staff documentation and evidence." See, Exhibit No. 3 (a).

5.64   As a sanction, the hearing's officer (Mr. Ewing) ordered the following punishment:

A.   "75 days" loss of "good conduct time" (GCT) which has added time to Sutton's sentence,
B.   "180 days" loss of priveleges, and
C.   "30 days" confined to her cell.

5.65   It was also ordered that Sutton be referred to the Snohomish County Prosecutor, for any felony charges to be filed against her. See, RCW 16.52.205 (3). Animal Cruelty.

Civil Rights Complaint - pg. 32.

5.66  Plaintiff immediately began to draft and submit an appeal to WSRU Superintendent Mr. Jack Warner.

## Plaintiff's Appeal

5.67  On June 1st 2022, Sutton filed her appeal.  *This appeal was assigned to defendant Paula Chandler.*

5.68  After defendant Chandler reviewed Sutton's appeal, she did not reverse the guilty finding, because she stated:

"No new evidence has been presented." See, *Exhibit No. 3(b).* Also, see Attachment No. 2.  *This decision to deny Sutton's appeal was made on June 13th 2022.*

5.69  Sutton did not have the benefit of a copy of the "9" supplemental reports for her appeal, and if you read the appeal, these records were not discussed, and were not attached to Sutton's appeal. That's because they were not served upon her.

Civil Rights Complaint— pg. 33.

5.70  Sutton also had no knowledge that Monroe P.D. had finished their investigation on May 18, 2022, because Sutton was not told about this, and it wasn't until months later that Sutton became aware of the truth concerning the results of said investigation.

5.71  Sutton couldn't use this police report (for a defense) during her hearing, or her appeal, because she had no knowledge of it at that time.

5.72  However, defendant Angel had knowledge of it, yet didn't disclose it.

5.73  Defendant Chandler didn't address, or respond to all of Sutton's arguments, or issues presented.

5.74  Plaintiff has submitted a further appeal to D.O.C. Headquarters by typed letter. Defendants have had this appeal for weeks now, yet there has been no response.

Civil Rights Complaint— pg. 34.

5.75  Once plaintiff became aware of the below police report; she has been requesting a new infraction hearing by kites to defendant Chandler. Sutton's requests have been denied.

The Monroe Police Report
and its Conclusions

5.76  Because Sutton hadn't heard any conclusions from Monroe P.D., Sutton decided to phone its office for answers.

5.77  On Friday August 5th-8th, 2022, Sutton phoned Monroe P.D., and spoke to a receptionist. Sutton inquired about the results of its investigation which began on "May 17th, 2022."

5.78  To Sutton's surprise, she was told that the investigation ended on May 18th 2022. Sutton was then told (for the first time), what the results were/are.

5.79  Plaintiff was told that the officer determined that:

Civil Rights Complaint—pg. 35.

"There is not enough evidence to show the rabbit was molested, or mistreated in any way." See, Exhibit No. 4. (police report).

5.80  This report refutes defendant O'Connor's infraction, and this report was completed on 5·18·22 days before O'Connor wrote her infraction narrative. See, Exhibit No. 3. (infraction report).

5.81  It is evident that the Monroe P.D. Officer did not believe that this alleged event took place, and that both Sutton and Eren were/are innocent. See, police Report No. 2022-7948. (56 pages).

5.82  According to the police report, defendant Angel gave copies of the "Supplemental incident reports" to the officer, and they were made apart of the police report, but not made apart of the infraction packet. This is why Sutton had no knowledge of what was stated by the D.O.C. employee witnesses, and Sutton was placed at a disadvantage.

Civil Rights Complaint — pg. 36.

5.83  Due to all the above, Sutton was not provided a Full or Fair right to be heard at her hearing held on May 31, 2022, or during her appeal, after the hearing.



Due to the Guilty verdict, Sutton was Re Classified, was "Demoted in her Custody Level," and D.O.C. HQ Decided to Transfer Sutton "Out-of-State."

5.84  On top of the "guilty" verdict, and loss of good-time-credits, Sutton was also "demoted" From minimum Custody (down 4 levels) to Maximum Custody, and was directed to remain in "long-term" Segregation.

5.85  Then D.O.C. HQ employee, Ms. Julie Martin Chaired the Classification Committee decision to have Sutton Sent to another prison "Out-of-State." See, Exhibit No. 5, and 5(a). (Ad. Seg records, and FRMT decision).

Civil Rights Complaint—pg. 37.

5.86   Sutton was not provided a fair opportunity to contest the decision to transfer her "out-of-state", and no due process hearing was ever held over this issue.

5.87   D.O.C. HQ employees have claimed that Sutton cannot be housed in general population "anywhere in Washington state", due to safety reasons. This was the central reason for the "out-of-state" transfer. See, Exhibit No. 5(a). (FRMT record).

5.88   Despite this claim, there has not been any "corroborated" evidence of a threat against Sutton, due to the infraction narrative, which was instigated by a D.a.c. employee, not instigated by Sutton.

5.89   Defendants created this clear "false narrative" against Sutton, and Eren, and plaintiff should not be punished for it.

Civil Rights Complaint—pg. 38.

The Involvement of
Defendants James Davis,
and David Brown

5.90   Again, Sutton has learned much since
the disclosure of the (above) Monroe police report.
For example, Sutton became aware of defendants
Davis and Brown's incident reports, which
were not included with the infraction report.

5.91   In these reports defendant Davis
admits that he also told plaintiff to "put the
rabbits down," and "do not pick them up." See,
Exhibit No. 2(a). (Davis report).

5.92   Soon thereafter Sutton sought
permission and from WSRU Captain McNeese,
and eventually received this permission to
"hold and pet the rabbits."

5.93   Soon after this, defendant Brown began
his "Stalking of plaintiff," and "Secretly" had
filed a 5.16.22 report, that Sutton was seen
"violently picking-up a rabbit."

Civil Rights Complaint — pg. 39.

5.94   After Sutton received permission from McNeese, Davis then advised Sutton of this, at the WSRU Yard Fenceline, just a day or two before the 5.17.22 incident.

5.95   Then, on 5.17.22 Davis was called to the alleged animal abuse scene by defendant Brown. After Davis examined the rabbit, he began to claim that he saw "the rabbit's privates" had been injured, even though law enforcement states that "no injuries existed."

5.96   Defendant Davis, and Brown then began to work together to draft a "false report" against Sutton, and Eren. You can read/see that the narrative had been changed over 4-6 hours after the alleged incident.

5.97   Upon information and belief, Sutton asserts there exists evidence showing that both defendants Davis, Brown, Balyeat, O'Connor, and others "worked-in-concert" to have both Sutton and Eren proceeded against based upon a "fabricated narrative", in order to cause them both harm.

Civil Rights Complaint - pg. 40.

5.98   Again, Sutton has requested a New infraction hearing, yet her requests have been denied. See, *Exhibit No. 6*. (copy of Kites).

5.99   *Most importantly, inmate Eren #399273,* has kindly submitted an "initial" Witness Statement in support of this Civil action. See, *Exhibit No. 7* (Statement). *This same Statement, was provided to the hearings officer, yet the hearings officer acted as if it made no difference to his ruling.*

5.100   Plaintiff believes that all defendants have acted wantonly, maliciously, and willfully, in order to cause damages to her, without a penological reason. Plaintiff has therefore suffered punishment at the hands of all defendants, when Sutton is "innocent."

///

///

///

Civil Rights Complaint — pg. 41.

## VI.  Summary of Above Narrative, and Aftermath of the Same

6.01   Plaintiff had been caring for the rabbits since early 2020 until May 17, 2022, at WSRU. For two years she dedicated her time, and resources to this task, and she was ~~good~~ at it.

6.02   Some defendants did not want her to care for them (the rabbits), and defendant Balyeat made a specific effort to target and harass Sutton repeatedly.

6.03   Plaintiff reported her concerns to Balyeat's immediate Supervisors, Captain ms. Ina McNeese, and defendant Davis.

6.04   Soon thereafter, defendant Davis informed Sutton she had been given permission to "hold and pet the rabbits," and Davis then advised his subordinate employees of this.

6.05   Then we have defendant Brown, and Balyeat making separate reports that Sutton was mistreating the rabbit named "Junior."

Civil Rights Complaint — pg. 42.

6.06   These reports by Brown, and Balyeat led to defendant Davis getting involved, and Davis drafted his individual report, making allegations that the rabbit had been injured.

6.07   These reports led to defendant Maria Angel being contacted, and the Monroe Police Department being called.

6.08   Sutton and Eren were escorted off the prison yard, and returned to their individual cells. They were then eventually placed into the Segregation Unit.

6.09   Monroe P.D. then interviewed both of them, and they were then told what the allegations were/are. Defendant Angel was present for these interviews, and was made aware of the results of the same.

6.10   Defendant Angel did not supply copies of "Exculpatory Evidence" to either Sutton or Eren, and these same records were not turned-over to the disciplinary office at WSRU.

Civil Rights Complaint—pg. 43.

6.11   Defendant Brown, Davis, and Balyeat Submit reports to defendant Angel, and she turns them over to law enforcement.

6.12   Law enforcement then determines the animal is healthy, and not harmed at all.

6.13   This makes defendants Brown, and Davis reports Suspicious, and not Consistent with the police determination, yet this matter was allowed to Continue unabated.

6.14   Immediately after the police left WSRU, the narrative began to be changed.

6.15   Then, defendant O'Connor got involved, and drafted an infraction against both Sutton and Erena. This infraction "isn't" Consistent with the above determination, or the D.O.C. incident reports.

6.16   Defendant O'Connor added to the narrative, and claimed (for the first time) that the rabbit had been "penetrated."

Civil Rights Complaint = pg. 44.

6.17   This infraction, along with the Withheld "Exculpatory Evidence", led to both Sutton and Eren being found guilty of abusing the rabbit.

6.18   The guilty verdict was based on "Staff documentation," and "evidence." Even though there was a "lack of evidence" presented at the hearing.

6.19   The guilty finding has caused Sutton numerous forms of punishment cited in this complaint.

6.20   Upon information and belief, the allegations made by defendants against Sutton, began soon after Sutton filed D.O.C. employee misconduct-complaints, and immediately after Sutton was granted permission to "hold and pet the rabbits."

6.21   Defendants had the means, motive, and opportunity to "retaliate" against Sutton, due to Sutton filing complaints against some defendants.

Civil Rights Complaint—pg. 45.

6.22   The infraction hearing was fundamentally unfair due to the above facts, and Sutton was not provided a fair opportunity to present exculpatory evidence during her hearing, or during her appeal.

6.23   Then D.O.C. headquarters has decided to reclassify Sutton, demote her in her custody level, place her in "long-term" solitary confinement, and order her to be transferred "out-of-state." Before all these above decisions were made, Sutton was not afforded a fair right to be heard.

6.24   Due to all the above facts, plaintiff has filed this civil action seeking much needed relief from this honorable court.

///

///

///

Civil Rights Complaint — pg. 46.

## VII.  Causes of Action

Count One

(42 U.S.C. § 1983 - First Amendment -
Retaliation In Response to Filing
Complaints, With Resulting Damages -
Against Defendants Davis, Brown, Balyeat,
and O'Connor).

   7.01  Plaintiff realleges, and incorporates
Paragraphs 5.01-5.100, along with paragraphs
6.01-6.24, with the same force and effect
as if such paragraphs were separately realleged
in this "First Claim For Relief."

   7.02  The First Amendment to the U.S.
Constitution, protects inmates (like plaintiff)
from "retaliatory actions" done to her,
because she felt the need to lodge
complaints to WSRU Captain McNeese, and
defendant Davis, regarding defendant
Balyeat's targeted harassment of her.

Civil Rights Complaint - pg. 47.

7.03  Plaintiff has a First Amendment right to File grievances/Complaints against any Washington State D.o.c. employee, who Commits an act that Would Constitute employee misconduct, or Would otherwise be a Violation of State, or Federal law.

7.04  Defendants actions in Filing reports alleging that Plaintiff had harmed a rabbit, when they knew this allegation was "False", does Not advance a legitimate, penological objective.

7.05  Plaintiff was in the care, Custody, and Supervision of defendants.

7.06  The reckless, or intentional Subjecting plaintiff to endure Public harassment From defendant Balyeat, and to then Punish her (because she reported his misconduct), with infracting her with a False narrative, Placing her in Segregation, and by doing this intending to cause Sutton harm, is inexcusable, and warrants this Courts review.

Civil Rights Complaint— pg. 48.

7.07  Defendants should have known, and had previous knowledge of, the damages that would be caused to Sutton, before they alleged that she had harmed a rabbit.

7.08  Defendants have knowledge of Plaintiff's reclassification decision, where D.O.C. headquarters employees have stated that (due to these allegations) Sutton is no longer "safe in a general population Setting", in any prison within Washington State.

7.09  Due to defendants retaliatory actions in "Fabricating" a narrative of "raping a bunny rabbit", Plaintiff has been placed within Segregation housing unit, for a "long-term-basis."

7.10  Due to defendants actions, Sutton may now endure, and suffer from an "out-of-state" transfer.

7.11  Defendants ignored the risks of harm to Plaintiff by "Fabricating" a narrative of animal abuse against plaintiffs.

Civil Rights Complaint — pg. 49.

7.12    Despite having an opportunity to do so, defendants took no action to stop the infraction from being drafted by defendants Balyeat, and O'Connor, and defendants allowed Sutton and Eren to remain housed in segregation, when they had knowledge that "the rabbit was not harmed" in any way whatsoever.

7.13    Defendants did not abate the risks, and dangers to plaintiff's health, and safety, when they all encouraged the infraction to be drafted, and promoted the "false narrative" that the animal had been "penetrated by Sutton", intending to cause Sutton damages.

7.14    As a direct and proximate result of the actions, or omissions of defendants as described in this complaint, plaintiff has suffered extreme emotional distress, threats of physical violence, future confrontations with people who think Sutton is guilty of harming this defenseless animal, along with damages to Sutton's character, and slander.

///

Civil Rights Complaint - pg. 50.

## Count Two

(42 U.S.C. §1983 - Fourteenth Amendment - Denial of Equal Protection - Against Defendants O'Connor, Angel, Davis, Brown, and Balyeat).

7.15  Plaintiff realleges, and incorporates paragraphs 5.01-5.100, along with paragraphs 6.01-6.24, with the same force and effect as if such paragraphs were separately realleged in this "Second Claim for Relief."

7.16  Plaintiff is a transgender woman, and a sexual assault survivor, who has been diagnosed with post traumatic stress disorder, and gender dysphoria.

7.17  Before the events described in this complaint, Sutton filed suit against employees of Washington State D.O.C., due to an assault she suffered at the hands of another inmate, and a delay in medical treatment. See, Sutton vs. Hathaway et al., Case No. 2:19-cv-01500-BAT.

Civil Rights Complaint - pg. 51.

7.18   Defendants Should therefore be made aware of who Sutton is, as defendant Angel Previously was employed at Monroe Prison's "Twin Rivers Unit" (TRU), where Sutton was Previously housed, and where the events described in Sutton vs. Hathaway took place.

7.19   Also, Defendant Angel is now the lead investigator at Monroe Corrections Complex, and is a close friend to defendant Cohn, (a defendant in the Sutton vs. Hathaway case), and Angel is also close friends with defendants Chandler, and O'Connor who both (now) work at TRU.

7.20   It is not a stretch to conclude that Defendant Angel has had conversations with Ms. Cohn about Sutton, or that Ms. Angel has conversated with defendants Chandler, and O'Conner about Sutton.

7.21   As a vulnerable transgender woman, Sutton is entitled to the same rights and Protections under the 14th Amendment, as any other inmate, regardless of her gender-identity, and mental health status, or disability.

Civil Rights Complaint - pg. 52.

7.22    Defendants imposed upon plaintiff discriminatory behaviors, and arbitrary actions when defendant Balyeat harassed Sutton on the WSRU yard, and publically demonized her with allegations of animal abuse, when defendant Brown "Stalked" Sutton secretly, and "Fabricated" animal abuse against her, when defendant Davis "Fabricated" injuries that were not present, when defendant Angel withheld Exculpatory Evidence from Sutton and Eren, and when defendant O'Connor, and Balyeat worked together to "Fabricate" a narrative against Sutton intending to cause harm.

7.23    These above actions by defendants, are discriminatory in nature and intent, because defendants have not treated any heterosexual prisoner in the same manner as they treated plaintiff, a known transgender woman.

7.24    Defendants actions in this case come from a place of "transphobia," and "transgender hatred."

7.25   By defendants withholding the Exculpatory Evidence from Sutton, she was not able to be "Fully heard" at her infraction hearing, or during her appeal.

7.26   Defendants actions in this case have caused, and continue to cause Sutton harm, because they have deprived her of a "Fair" right to be heard, and are discriminatory in nature, and intent.

7.27   As a direct and proximate result of the actions, or omissions of defendants as described in this complaint, Plaintiff has suffered extreme emotional distress, (a guilty verdict when she is innocent), threats of physical violence, future confrontations with people who think she is guilty of harming this defenseless animal, along with damages to her character, and slander.

7.28   On top of all this, Sutton may now be transferred "out-of-state" due to defendants actions in this case.

Civil Rights Complaint – pg. 54.

## Count Three

(42 U.S.C. § 1983 — Fourteenth Amendment —
Denial of Procedural Due Process in a
Disciplinary Infraction Hearing, and
During the Appeal of the Guilty Finding —
Against Defendants Chandler, O'Connor,
and Angel).

7.29   Plaintiff realleges, and incorporates
paragraphs 5.01 – 5.100, along with paragraphs 6.01 – 6.24,
with the same force and effect as if such
paragraphs were separately realleged in this
"Third Claim for Relief."

7.30   The Fourteenth Amendment to the U.S.
Constitution, protects inmates (like Sutton)
from "Unfair" disciplinary infraction hearings,
and from "Unfair" appeals of a guilty verdict.

7.31   In this case, Plaintiff was not provided
with a copy of the "Exculpatory Evidence"
associated with the allegations that Sutton had
harmed a bunny rabbit.

Civil Rights Complaint — pg. 55.

7.32    Defendant Angel was in possession of this "exculpatory evidence" before the infraction was drafted, or served upon Sutton.

7.33    Defendant O'Connor was the First person to allege "penetration" of the rabbits anus, when she had previous knowledge that her allegation(s) were/are False, and do not match the supplemental reports Filed by other D.o.c. employees.

7.34    Defendant Chandler was made aware that there existed "Exculpatory Evidence" refuting O'Connor's infraction, yet she denied Sutton her request For a new infraction hearing.

7.35    Defendant Angel, and O'Connor did not turn-over the exculpatory evidence to the Major hearings office, when by D.o.c. policy they were mandated to do so. See, DOC Policy No. 460.000 Directive IV.C.

7.36    All of these combined actions done by the above defendants, caused a Fundamentally "Unfair" infraction hearing, and appeal.

Civil Rights Complaint — pg. 56.

7.37  This resulted in Sutton being Found guilty at her infraction hearing, and due to this, this guilty verdict cannot stand.

7.38  The result(s) of the unlawful guilty verdict have been one punishment on top of another. Sutton has been sanctioned with "75 days" loss of good-conduct time (GCT), which has extended the amount of time Sutton must serve. Sutton has been demoted in her custody level from minimum — to — maximum security. Sutton has also been directed to stay in Segregation "long-term" on a "program," while she waits for an eventual "out-of-State" transfer.

7.39  Sutton's guilty verdict was shared by defendants with all Monroe Prison employees, who then verbally spread it around the facility, casting a very negative, and demonic image upon Sutton.

///

Civil Rights Complaint - pg. 57.

7.40   As a direct and proximate result of the actions, or omissions of defendants as described in this complaint, plaintiff has suffered extreme emotional distress, (due to the allegations, and guilty verdict), threats of physical violence, future confrontations with people who think Sutton is guilty of harming this defenseless animal, along with damages to Sutton's character, and slander.

7.41   Through defendants actions, Sutton has suffered bodily injury, pain and suffering, and extreme mental, and emotional distress.

7.42   Due to all the above facts, with supporting evidence, Sutton submits this complaint, praying for the relief requested below.

///

///

///

Civil Rights Complaint - pg. 58.

## VIII.    Prayer For Relief

Wherefore, Plaintiff requests that this Honorable Court enter judgment in her favor, and against all defendants, on each and every Count in this Complaint, and enter an Order, awarding the following relief:

A.    A preliminary injunction, temporarily stoping the "out-of-state" transfer, and directing Plaintiff to be housed at a facility within Washington State, along with a directive that Plaintiff be released from Segregated Confinement immediately; and

B.    A Court order awarding punitive damages for Plaintiff, and against all individually named defendants, according to proof at trial; also

C.    A Court order for reasonable attorney's fees, and Costs, pursuant to applicable law; and

D.    A Court order awarding Plaintiff the Costs of Suit incurred herein, along with nominal damages; also

Civil Rights Complaint - pg. 59.

E. A Court order awarding plaintiff, such other relief as this Court may deem just.

## IX. Conclusion With Verification

Pursuant to Title 28 U.S.C. § 1746, Plaintiff declares, and verifies under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed on this 25th day of Sept., 2022. At the City of Monroe, Snohomish County, WA..

C.C.: Plaintiff, Court Clerk, Defendants.

Jason "J.Lee" Sutton aka: "Jennifer Lee" Sutton Pro se Plaintiff, D.O.C. No. 730954 MCC—IMU—A 204 Monroe, Corr. Complex, P.O. Box # 777, Monroe, WA. 98272. (253)·248·3957. Email: Voices From inside out@ gmail.Com

Civil Rights Complaint - pg. 60.



Jason "J.Lee" Sutton #730154
a.k.a. "Jennifer Lee" Sutton
MCC - IMU - A.204
Monroe Corrections Complex,
P.o. Box # 777,
Monroe, WA. 98272-0777.

LEGAL !
MAIL.

To: Clerk, U.S. District Court,
Western District, at Seattle,
700 Stewart Street,
Seattle, WA. 98101.



FILED          MAIL
LODGED
RECEIVED

SEP 28 2022

CLERK AT SEATTLE COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

Legal Mail

FP US POSTAGE
$ 003.60
CORRECTION
ZIP 98272
09/26/2022
034A 0081801810

