1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8    JENNIFER JAYLEE,

9                              Plaintiff,          Case No. C22-1392-KKE-MLP

10          v.

11   LESLIE O'CONNOR,                              REPORT AND RECOMMENDATION

12                              Defendant.

13

14                    I.       INTRODUCTION

15          Plaintiff Jennifer Jaylee[1] is in the custody of the Washington Department of Corrections

16   ("DOC") and is currently confined at the Washington State Penitentiary in Walla Walla

17   Washington ("WSP"). Plaintiff's claims arise out of her confinement at the Monroe Corrections

18   Complex – Washington State Reformatory Unit ("MCC-WSR") in 2021 and 2022. Plaintiff's

19   third amended complaint ("TAC"), filed through counsel on November 30, 2023, is the operative

20   complaint in this action. (TAC (dkt. # 40).) This matter is now before the Court on Defendant's

21   motion for summary judgment. (Def.'s Mot. (dkt. # 59-2).) Plaintiff has filed a response

22

23   _____
[1] At the time of events giving rise to this action, Plaintiff was known as Jason Sutton and that name
appears in much of the evidence submitted in relation to the pending motion for summary judgment.
According to Plaintiff, she legally changed her name from Jason Sutton in 2023. (*See* dkt. # 65 at 3 n.1.)

REPORT AND RECOMMENDATION
PAGE - 1

opposing Defendant's motion (Pl.'s Resp. (dkt. # 65)), and Defendant has filed a reply brief in support of her motion (Def.'s Reply (dkt. # 72)). The Court, having reviewed Plaintiff's third amended complaint, Defendant's summary judgment motion, all briefing of the parties, and the remaining record, concludes that Defendant's motion should be granted, and that Plaintiff's TAC and this action should be dismissed with prejudice.

## II.    BACKGROUND

### A.    Procedural History

Plaintiff filed her original civil rights complaint, *pro se*, on September 28, 2022. (Dkt. # 1.) Plaintiff was at that time confined at the MCC – Intensive Management Unit ("IMU"). (*See* dkt. ## 1, 7.) Plaintiff alleged in her complaint claims arising out of an incident that occurred in the MCC-WSR prison yard on May 17, 2022. (*See* dkt. # 7 at 18-58.) The incident in question involved Plaintiff's purported attempt to clean a rabbit that had migrated into the prisoner yard and resulting accusations by correctional officers that Plaintiff had molested the rabbit. (*See id.*) Plaintiff was infracted for, and found guilty of, animal cruelty. (*See id.*) Plaintiff claimed in her original pleading that the guilty finding was based on fabricated and/or incomplete evidence. (*See id.*) The Court deemed Plaintiff's complaint deficient and therefore declined to serve it, but granted Plaintiff leave to file an amended complaint correcting the deficiencies in her original pleading. (Dkt. # 8.)

Plaintiff filed an amended complaint on January 9, 2023, which by and large failed to correct the deficiencies previously identified by the Court. (Dkt. # 11.) The Court therefore declined to serve that pleading as well but, once again, granted Plaintiff an opportunity to file an amended pleading. (Dkt. # 17.) While the Court was awaiting Plaintiff's submission of her

second amended complaint, counsel appeared on Plaintiff's behalf and, on May 15, 2023, counsel filed a second amended complaint. (Dkt. ## 20, 23.)

Plaintiff named as Defendants in her second amended complaint Leslie O'Connor, a Unit Manager at MCC-WSR at times relevant to the complaint, and Does I through X, all of whom were identified only as employees of the State of Washington. (Dkt. # 23 at 2.) Plaintiff identified two claims for relief in her second amended complaint. Specifically, Plaintiff alleged that Defendants violated her rights under the Eighth Amendment when they were deliberately indifferent to her serious medical needs. (*See id*. at 5-6.) Plaintiff also alleged that Defendants retaliated against her, in violation of her First Amendment rights, by falsely claiming that Plaintiff was in danger and needed to be transferred out of state in order to "'chill' Plaintiff's grievance and complaint activity." (*Id*. at 6.) The facts set forth by Plaintiff in her second amended complaint pertained only to the specific conduct of Defendant O'Connor. (*See id*. at 3-5.)

Several months later, on October 18, 2023, Plaintiff filed a motion seeking leave to amend her complaint together with a proposed TAC. (*See* dkt. ## 35, 36-1.) Plaintiff's proposed TAC identified an additional three defendants, and two new causes of action, including a due process claim and an equal protection claim. (*See* dkt. # 36-1.) Though Plaintiff sought to add new defendants to this action by way of her TAC, the facts alleged in that pleading were essentially the same as those alleged in the second amended complaint and, thus, pertained only to the conduct of Defendant O'Connor and not to any of the proposed new defendants. (*See id.* at 3-5.) The Court granted Plaintiff's motion for leave to amend to the extent she sought to add a due process claim against Defendant O'Connor but denied the motion in all other respects. (Dkt. # 39.) As noted above, Plaintiff's TAC is the operative pleading in this action.

REPORT AND RECOMMENDATION
PAGE - 3

The first three claims alleged in Plaintiff's TAC are the claims upon which she was permitted to proceed. Plaintiff alleges in her first claim that her Eighth Amendment right to be free from cruel and unusual punishment was violated when defendants acted with deliberate indifference to her serious medical needs as a transsexual who suffers from gender dysphoria. (TAC at ¶ 29.) Plaintiff contends that defendants knew of her condition and chose to keep her in solitary confinement for 10 months and threatened her with a transfer out of state. (*Id.*) Plaintiff alleges in her second claim that defendants falsely claimed she was in danger and needed to be transferred out of state in order to "chill" her grievance and complaint activity, in violation of her First Amendment right to be free from retaliation. (*Id.* at ¶ 35.) Finally, Plaintiff alleges in her third claim that her due process rights under the Fourteenth Amendment were violated when she was housed in solitary confinement for almost a year based on false allegations that her life was in danger and that she needed to either be kept in isolation or transferred out of state. (*Id.* at ¶ 41.)

Defendant filed her pending motion for summary judgment together with eleven supporting declarations on May 28, 2024. (*See* dkt. ## 47-58.) Shortly thereafter, on May 31, 2024, Defendant submitted a corrected version of her motion for summary judgment and asked that it be substituted for the original. (*See* Def.'s Mot.) The corrected version of Defendant's motion for summary judgment is deemed the operative motion. On the same date, Defendant submitted a corrected version of the declaration of her counsel, Aaron Williams, filed with her original motion for summary judgment and asked that it also be substituted for the original. (First Williams Decl. (dkt. # 59-1).) The corrected version of the Williams declaration has been substituted for the original version (dkt. # 58) and is deemed the operative declaration of counsel.

Plaintiff filed a response to Defendant's motion on June 28, 2024, together with declarations of Plaintiff and of Plaintiff's counsel. (*See* dkt. ## 65-67.) The version of Plaintiff's declaration originally submitted with her response was not signed, but a signed version was filed shortly thereafter and the substituted version of Plaintiff's declaration (Pl.'s Decl. (dkt. # 68)) is deemed the operative declaration.

Defendant filed a reply in support of her motion on July 12, 2024, together with a second declaration of counsel. (*See* Reply; Second Williams Decl. (dkt. # 73)).) The briefing is now complete, and Defendant's motion for summary judgment is ripe for review.

**B.    Facts**

*1.    Transfer to Airway Heights Corrections Center*

Plaintiff has been in the custody of the DOC since 1995, and from late October 2019 to January/February 2023, she was housed at MCC-WSR. (*See* O'Connor Decl. (dkt. # 55), Ex. 3 at 1; Pl.'s Decl. at ¶ 2.) In 2021, the DOC decided to close MCC-WSR to the general population. (*See* O'Connor Decl. at ¶ 4, Ex. 1.) As a result, in the fall of 2021 many MCC-WSR inmates, including Plaintiff, were in the process of being transferred to other DOC facilities. (*See id.*; *see also* Brule Decl. (dkt. # 50) at ¶ 3.)

Pursuant to DOC policy, when a change in classification or housing is contemplated, a Facility Risk Management Team ("FRMT") convenes to address custody designations and transfers, program expectations, individual needs, and facility placement recommendations. (*See* Brule Decl. at ¶ 4(a).[2]) An FRMT includes, at a minimum, the inmate, the assigned case manager, the Correctional Unit Supervisor, and a custody/security representative. (*See id.*) Some

---

[2] The Brule declaration contains two paragraphs designated as paragraph 4. (*See* Brule Decl. at 2.) The Court will refer to these two paragraphs as paragraph 4(a) and paragraph 4(b).

REPORT AND RECOMMENDATION
PAGE - 5

FRMTs are designated as multidisciplinary and may include other professionals when their presence is relevant to the needs of the incarcerated individual. (*Id.*) A multidisciplinary FRMT was convened in contemplation of Plaintiff's transfer out of MCC-WSR because Plaintiff is transgender, and her housing review was therefore subject to the DOC's transgender housing protocol. (*See id.* at ¶ 4(b); O'Connor Decl. at ¶ 5.)

Pursuant to that protocol, when transfer of a transgender inmate is being contemplated, staff at the sending facility are required to contact DOC headquarters to determine which other facilities are appropriate for the inmate and have bed space. (Brule Decl. at ¶ 4(b); *see also* O'Connor Decl. at ¶ 5.) In accordance with the protocol, prior to Plaintiff's FRMT meeting, her facility counselor, Carlos Pineda-Lopez, contacted Headquarters Corrections Specialist Christine Brule who began researching an appropriate placement for Plaintiff. (*See* Brule Decl. at ¶ 5; O'Connor Decl. at ¶ 5.) Ms. Brule determined that Airway Heights Corrections Center ("AHCC") was the only viable option for Plaintiff, and she communicated this information to Mr. Pineda-Lopez in advance of the FRMT meeting. (*See id.*)

Plaintiff's FRMT meeting was held on October 14, 2021, and Defendant O'Connor chaired that meeting. (O'Connor Decl. at ¶ 3; Pl.'s Decl. at ¶ 3.) During the meeting, the group discussed the headquarters recommendation that Plaintiff be transferred to AHCC, and Plaintiff expressed concerns about being transferred to AHCC or any male facility, and about being housed with strangers. (*See* O'Connor Decl. at ¶ 6; Pl.'s Decl. at ¶¶ 5, 6.) Ultimately, the FRMT, with the exception of Plaintiff, agreed with the recommendation to transfer her to AHCC. (O'Connor Decl. at ¶ 6; Brule Decl. at ¶ 7.) The decision to approve Plaintiff's transfer to AHCC was subsequently made at DOC headquarters. (*See* O'Connor Decl. at ¶ 7; Brule Decl. at ¶ 7.)

Following the hearing on October 14, 2021, Plaintiff contacted the Office of Corrections Ombuds ("OCO") to make a complaint about the decision to move her to AHCC. (Pl.'s Decl. at ¶ 9.) In addition, on or about October 15, 2021, Plaintiff wrote a letter explaining her disagreement with the proposed transfer, and gave the letter to her counselor, Mr. Pineda-Lopez. (*Id.* at ¶ 11.) Plaintiff has variously referred to that letter as an "appeal" and an "employee misconduct complaint." (*See id.*; TAC at ¶ 15; First Williams Decl., Ex. 2 at 4.) However, on the document itself, Plaintiff identified it as "Objections & Strong Disagreement With F.R.M.T. Decision, Recommending Transfer to 'Airway Heights Corrections Center (AHCC),'" and the document was directed to "MCC-WSR, F.R.M.T. (Baker/Adams Unit)." (First Williams Decl., Ex. 3 at Ex. A.)

According to Plaintiff, Mr. Pineda-Lopez told her he would give a copy of the letter to Defendant O'Connor and the other FRMT members and would put a copy in a DOC database. (*See* Pl.'s Decl. at ¶ 11; TAC at ¶ 15; First Williams Decl., Ex. 2 at 4.) Plaintiff alleges that shortly after turning over her letter to Mr. Pineda-Lopez, Defendant O'Conner, on October 18, 2021, confronted Plaintiff in her housing unit and told her, "You'll regret filing a complaint against me." (TAC at ¶ 16; Pl.'s Decl. at ¶ 12.)

Plaintiff alleges that on December 5, 2021, she met with a Counselor Stouffer who, like Mr. Pineda-Lopez, was a member of Plaintiff's FRMT, and that they discussed Plaintiff's October 15, 2021 "appeal." (*See* TAC at ¶ 17; *see also* First Williams Decl., Ex. 2 at 5.) Plaintiff alleges that shortly after her meeting with Counselor Stouffer, Defendant O'Connor, on December 10, 2021, again confronted her and told her she should not have filed a complaint against her. (TAC at ¶ 18; Pl.'s Decl. at ¶ 14; *see also* First Williams Decl., Ex. 2 at 5.)

Defendant O'Connor denies the alleged confrontations in October and December 2021 occurred, and maintains she was not aware of any complaint Plaintiff may have filed against her at the time of these interactions. (O'Connor Decl. at ¶ 9.) According to Defendant O'Connor, she was aware Plaintiff had submitted a letter around the time of the FRMT meeting explaining her concerns about the move to AHCC, but the letter did not mention her, and she did not perceive it as a complaint against her. (*Id*. at ¶ 8.)

Plaintiff alleges that in late December 2021, after Defendant O'Connor purportedly confronted her a second time about having filed a complaint about Defendant, Plaintiff was told by Captain Ina McNeese that she had heard Defendant O'Connor was angry with her and that it "had something to do with a transfer, and how you've been interacting with the wild rabbits in the yard." (*See* TAC at ¶ 19; First Williams Decl., Ex. 2 at 5.) According to Captain McNeese, this conversation did not occur. (McNeese Decl. (dkt. # 54) at ¶ 4.)

### 2.    The Rabbit Incident

On May 17, 2022, Plaintiff was in the prison yard at MCC-WSR with fellow inmate Julian Eren and was handling one of the wild rabbits that inhabited the MCC outdoor yard. (*See* Pl.'s Decl. at ¶¶ 17, 21-24.) The rabbit was one Plaintiff was familiar with and referred to as "Junior." (*See id*. at ¶¶ 17, 22.) According to Plaintiff, she and Mr. Eren intended to bathe the rabbit that day because it was covered in urine and fecal matter. (*Id*. at ¶ 21.)

As Plaintiff and Mr. Eren walked across the prison yard with their cleaning supplies, they caught the attention of Officer Ben Balyeat who was stationed in a tower at the WSR yard. (Balyeat Decl. (dkt. # 48) at ¶¶ 2, 5.) Officer Balyeat used his binoculars to watch Plaintiff and Mr. Eren and, as they reached the far corner of the yard, Officer Balyeat saw Plaintiff pick up a rabbit, which was "squirming and flailing," and hand it to Mr. Eren. (*Id*. at ¶ 6.)

REPORT AND RECOMMENDATION
PAGE - 8

Officer Balyeat put the binoculars down and made a radio call to alert staff to what he was observing, and he said something to the effect of "I need two individuals removed from the yard to yard in for molesting rabbits." (Balyeat Decl. at ¶ 7.) Officer Balyeat explains that he used the word "molesting" because he is "an older person and to me the word molesting means its traditional definition: to annoy, disturb, persecute, and harass a person or animal." (*Id.*)

MCC Corrections Sergeant ("Sgt.") Katie Daniels, together with other corrections officers, responded to Officer Balyeat's call. (*See* Daniels Decl. (dkt. # 52), Ex. 1; *see also* O'Connor Decl., Exs. 5, 7.) When Sgt. Daniels approached Plaintiff and inmate Eren in the yard and asked what they were doing, Plaintiff responded that the bunny was going to be adopted by a corrections officer, but it was having "trouble pooping" so they were helping it. (Daniels Decl., Ex. 1; *see also* O'Connor Decl., Ex. 5.) Plaintiff had clear plastic gloves on, and there was a towel under the rabbit that was covered in smeared feces and pellets. (Daniels Decl., Ex. 1.)

Plaintiff and Mr. Eren were thereafter escorted from the yard and returned to their housing unit at the direction of Sgt. Daniels. (*See* Daniels Decl., Ex. 1; O'Connor Decl., Ex. 7.) Plaintiff was subsequently placed in administrative segregation pending investigation of the rabbit incident, a placement that was authorized by Defendant O'Connor and approved by Associate Superintendent John Padilla. (*See* Caldwell Decl. (dkt. # 51), Ex. 1; O'Connor Decl. at ¶ 15, Ex. 8 at 1.) A hearing regarding Plaintiff's segregation placement was conducted by an administrative segregation hearing officer on May 19, 2022, and it was determined that Plaintiff would remain in administrative segregation at that time. (*See* O'Connor Decl., Ex. 8 at 2-3.)

Although Defendant O'Connor did not witness Plaintiff's interaction with the rabbit on May 17, 2022, she was tasked with writing an infraction regarding the incident. (*See* O'Connor Decl. at ¶ 12.) To this end, Defendant O'Connor collected the numerous incident reports

submitted by staff members who either witnessed or were involved in the incident and, working with Associate Superintendent John Padilla, wrote a serious infraction report charging Plaintiff with a "violation of WAC 507 – Committing an act that would constitute a felony and that is not otherwise included in these rules." (*See id*. at ¶ 12, Ex. 4 at 1.) The underlying felony was identified as animal cruelty in the first degree, a violation of RCW 16.52.205, and was alleged to have been committed "[b]y digitally penetrating the rectum/anus of the rabbit." (*See id.*, Ex. 4 at 1.) The infraction was submitted on May 23, 2022.[3] (*See id.*, Ex. 4.)

On the same date the infraction was submitted, Defendant O'Connor completed a segregation investigation and notated Plaintiff's segregation placement record with a very brief summary of her findings and comments indicating there were safety concerns should Plaintiff return to general population, a "WAC 507" had been submitted, and there was a prohibited placement request pending. (O'Connor Decl., Ex. 8 at 1.) The prohibited placement request was a document prepared by MCC-WSR Counselor Cathy Kopoian, at Defendant's direction, which requested that Plaintiff be prohibited from being housed at MCC based on the incident involving the rabbit. (*See id*. at ¶ 16, Ex. 9.) Counselor Kopoian noted in the request that "MCC has a large quantity of wild rabbits that frequent all facilities; incarcerate[d] individuals are fond of the wildlife." (*Id*., Ex. 9 at 1.)

The request was reviewed by MCC Intelligence and Investigations Unit investigator Keith LaMunyon and an associated statewide committee, *i.e.*, the Facility/State Separation/

---

[3] Because of the nature of the alleged incident, the police were called the afternoon the incident occurred and an officer with the Monroe Police Department ("MPD") was dispatched to investigate it. (*See* Declaration of Daryl Parker (Parker Decl.), Ex. C.) The MPD officer who responded to the call collected evidence, interviewed Plaintiff, surveyed the prison yard, inspected the area where the incidence was alleged to have occurred, and looked at the rabbit. (*See id*., Ex. C at 1, 17-18.) The officer concluded there was insufficient evidence to show the rabbit had been molested or mistreated, and it appears the investigation was closed on May 25, 2022. (*See id*., Ex. C at 1, 19.)

Prohibition Committee ("FASSAP"). (*See* O'Connor Decl., Ex. 9 at 3.) The FASSAP Committee agreed to a five-year prohibition on Plaintiff's placement at MCC, but noted as well that an out-of-state ("OOS") placement may be sought as there were "safety concerns at all safe harbors and active mainlines due to the nature of this offense." (*See id*.)

On May 31, 2022, a disciplinary hearing was held regarding the WAC 507 infraction, at which Plaintiff was found guilty of the violation. (Second Williams Decl., Ex. 1, Attach. H.) The disciplinary hearing officer imposed a sanction of 75 days loss of good conduct time, 180 days loss of privileges, and 30 days of cell confinement. (*Id.*) Plaintiff appealed the finding of guilt, and the decision of the hearing officer was affirmed. (*See id.*, Attach. I, J.)

On October 24, 2022, Defendant O'Connor resubmitted the infraction at the direction of DOC headquarters because, upon issuance of the original infraction, the incident reports were erroneously submitted as evidence and not attached to the infraction as they should have been. (O'Connor Decl. at ¶ 21, Ex. 11; *see also* Second Williams Decl., Ex. 1, Attach. K.) A new disciplinary hearing was held on November 16, 2022, and Plaintiff was once again found guilty, and the same sanctions were imposed. (Second Williams Decl., Ex. 1, Attach. R.) Plaintiff once again appealed, and the decision of the hearing officer was once again affirmed. (Pl.'s Decl., Ex. E at 2.) According to Plaintiff, the DOC "eventually" reversed the charges and the punishment, let her out of solitary confinement and, in early 2023, transferred her to WSP. (*Id*. at ¶ 42.)

### III.    DISCUSSION

Defendant argues in her motion for summary judgment that she is entitled to qualified immunity from Plaintiff's claims because Plaintiff cannot show that Defendant violated Plaintiff's constitutional rights, or that the law forbidding Defendant's conduct was clearly established at the time it occurred. (*See* Def.'s Mot. at 12-25.) Plaintiff argues that there are

material issues of fact as to whether Defendant O'Connor retaliated against her or whether Defendant is entitled to judgment on that claim as a matter of law. (Pl.'s Resp. at 9-12.) Plaintiff further argues that there are material issues of fact as to whether she was deprived of due process when she was forced to live in solitary confinement for ten months. (*Id*. at 12-17.) Finally, Plaintiff argues that Defendant is not entitled to qualified immunity. (*Id*. at 17-18.)

### A.    Applicable Standards

#### *1.    Summary Judgment Standard*

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the non-movant's case, or by establishing that the non-movant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. V. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the non-moving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the non-moving party. *Id*. at 585-87.

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the

fact." Fed. R. Civ. P. 56(c)(1). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the non-moving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

### 2.    Section 1983 Standard

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show that (1) she suffered a violation of rights protected by the Constitution or created by federal statute, and (2) the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355

1   (9th Cir. 1981) (citing *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)). "The inquiry into

2   causation must be individualized and focus on the duties and responsibilities of each individual

3   defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer*

4   *v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).

5                    *3.        Qualified Immunity Standard*

6           Qualified immunity protects government officials from civil liability under § 1983 so

7   long as their conduct does not violate clearly established constitutional or statutory rights of

8   which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

9   (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity "gives government

10  officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the

11  plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731,

12  743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

13          In order to determine if an officer is entitled to qualified immunity, a court must evaluate

14  two independent prongs: (1) whether the officer's conduct violated a constitutional right, and (2)

15  whether that right was clearly established at the time of the incident." *Castro v. County. of Los*

16  *Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (citing *Pearson*, 555 U.S. at 232). Either

17  prong may be considered first. *Pearson*, 555 U.S. at 236. As discussed below, this Court

18  concludes Plaintiff has not established that Defendant violated her constitutional rights. The

19  Court therefore need not address the second prong of the qualified immunity analysis.

20  **B.      Analysis**

21                   *1.        Deliberate Indifference*

22          Plaintiff alleges in count one of her TAC that Defendant violated her Eighth Amendment

23  rights when she acted with deliberate indifference to Plaintiff's serious medical needs. (TAC at

REPORT AND RECOMMENDATION
PAGE - 14

¶ 29.) Plaintiff claims that Defendant knew she was transsexual and suffering from gender dysphoria and chose to punish her by placing her in solitary confinement for ten months and threatening to transfer her out of state. (*See id.*)

Defendant argues in her motion for summary judgment that Plaintiff's Eighth Amendment claim fails because putting a prisoner in protective custody or threatening to transfer a prisoner out of state to ensure the safety of the prisoner is constitutional. (Def.'s Mot. at 12-15.) Plaintiff does not address any of Defendant's arguments relating to her Eighth Amendment claim in her response to Defendant's motion, focusing her arguments instead on her retaliation and due process claims. (*See* Pl.'s Resp. at 2, 9-18.) Defendant asserts that Plaintiff appears to have abandoned her Eighth Amendment claim. (*See* Def.'s Reply at 9.) This Court concurs.

The Ninth Circuit has held that a plaintiff abandons claims "by not raising them in opposition to [the defendant's] motion for summary judgment." *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) (citing *Jenkins v. Cnty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)).) Because Plaintiff makes no mention of her Eighth Amendment claim in her response to Defendant's summary judgment motion, this Court deems the claim abandoned and therefore will not address the merits of the claim.

### 2. Retaliation

Plaintiff alleges in count two of her TAC that Defendant falsely claimed Plaintiff was in danger and needed to be transferred out of state, with no factual basis or real belief that she was actually in danger, in order to "chill" her grievance and complaint activity, in violation of her First Amendment right to be free from retaliation. (TAC at ¶ 35.) In discovery, Defendant O'Connor attempted to clarify Plaintiff's retaliation claim, and Plaintiff offered a different version of the claim than was alleged in her pleading. Specifically, Plaintiff alleged in her

responses to Defendant's discovery requests that Defendant retaliated against her for having filed a "DOC employee misconduct complaint" and a complaint with the OCO regarding Defendant's actions during the October 14, 2021 FRMT meeting at which Plaintiff's transfer to AHCC was discussed. (First Williams Decl., Ex. 2 at 4-5.)

Plaintiff went on to identify the actions Defendant O'Conner allegedly took in retaliation for Plaintiff having filed the purported complaint. (First Williams Decl., Ex. 2 at 4-5.) In particular, Plaintiff alleged that (1) during the week of October 18, 2021, Defendant confronted her on a tier in the A-Unit of MCC-WSR and said to her, "You'll regret filing a complaint against me"; (2) in December 2021, Defendant again confronted her in the A-Unit and told her, "You shouldn't have filed a complaint against me"; (3) between January and February 2022, Defendant displayed hostility towards Plaintiff and made it a point to stare at her "with a mean look on her face," which Plaintiff interpreted as an attempt by Defendant to intimidate her; (4) in a discussion with Captain Ina McNeese in December 2021, Captain McNeese confirmed that Defendant was angry with Plaintiff and that it "had something to do with a transfer, and how you've been interacting with the wild rabbits in the yard"; (5) on May 17, 2022, Defendant accused her of "digitally/sexually assaulting one of the rabbits," and generated a serious infraction report against her; and (6) after being found guilty at her infraction hearing on May 31, 2022, Defendant falsely stated there were credible threats of harm to Plaintiff and made the decision to keep Plaintiff confined in restrictive housing for ten months. (*Id.*)

A First Amendment retaliation claim in the prison context has five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate, (2) because of, (3) that prisoner's protected conduct, and that such action, (4) chilled the inmate's exercise of [her] First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional

goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). To prevail on a retaliation claim, "a plaintiff must show that [her] protected conduct was the substantial or motivating factor behind the defendant's conduct." *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (citation and internal quotation omitted). In addition, a plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which [s]he complains." *Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir. 1995). The Court evaluates a retaliation claim in light of the deference accorded prison officials. *Id*. at 807.

Defendant argues that Plaintiff cannot show an issue of material fact exists to support a claim for retaliation based on any of the adverse actions identified by Plaintiff in discovery. (*See* Def.'s Mot. at 16-21.) Defendant then proceeds to discuss each of the alleged adverse actions and points to evidence in the record, or a lack thereof, that supports her argument that Plaintiff has not established the elements of a retaliation claim as to each. (*See id*.)

Plaintiff, rather than address Defendant's specific arguments with respect to the elements of her retaliation claim, argues more generally that the fact that Defendant denies certain of Plaintiff's specific allegations "highlights the need for a trial." (*See* Pl.'s Resp. at 11.) Plaintiff notes, in particular, Defendant's denial of any awareness that Plaintiff had filed a complaint about her, and Defendant's denials about having called the police regarding the rabbit incident[4] and about confronting Plaintiff about her purported complaints. (*Id*.) Plaintiff goes on to argue that Defendant's claim that she was not personally involved in anything after Plaintiff's initial placement in administrative segregation and should not be held liable for what happened

---

[4] There is no dispute that the police were called, but Plaintiff claims Defendant O'Connor made the call while Defendant claims that the call was made by MCC-WSR Chief Investigator Maria Angel. (*See* Pl.'s Resp. at 4; O'Connor Decl. at ¶ 13.) However, the question of exactly who made the call is not pertinent to resolution of Plaintiff's retaliation claim.

REPORT AND RECOMMENDATION
PAGE - 17

1  thereafter takes too narrow a view of causation, and Plaintiff maintains that Defendant, in falsely

2  accusing her of animal cruelty and infracting her for it, "set in motion a series of events that

3  resulted in all of Jaylee's harm." (*Id.*) As discussed below, Plaintiff's arguments fail to advance

4  her retaliation claim.

5      In this Court's view, the issue of causation is dispositive of Plaintiff's retaliation claim

6  and the Court will therefore focus its discussion on that element of the retaliation standard. As

7  explained above, in order to prevail on her retaliation claim, Plaintiff must show that her

8  protected conduct was the substantial or motivating factor behind Defendant O'Connor's alleged

9  adverse actions. *See Broadheim*, 584 F.3d at 1271. Plaintiff's claim is premised on her assertion

10 that she filed an employee misconduct complaint and an OCO complaint against Defendant

11 O'Connor related to her actions at the October 14, 2021 FRMT meeting and that those

12 complaints caused Defendant O'Connor to engage in a series of retaliatory behaviors in the

13 ensuing months. Missing from the record, however, is evidence that Plaintiff ever filed any

14 complaints directed at the conduct of Defendant O'Connor.

15     The evidence demonstrates that the "employee misconduct complaint" Plaintiff

16 purportedly filed against Defendant O'Connor was, in fact, the letter Plaintiff directed to MCC-

17 WSR and the FRMT, which she identified as "Objections" to the FRMT's October 14, 2021

18 decision recommending her transfer to AHCC. (*See* First Williams Decl., Ex. 3 at Ex. A, Ex. 5 at

19 4, Ex. 6 at 3; Pl.'s Decl. at ¶ 11.) Plaintiff confirmed during discovery that the substance of her

20 complaint to the OCO was the same as that of her October 15, 2021 letter. (*See id*., Ex. 5 at 4-5.)

21     Notably, Plaintiff's letter does not specifically reference Defendant O'Connor at all but,

22 rather, addresses the "F.R.M.T.'s recommendation." (First Williams Decl., Ex. 3 at Ex. A.) Also

23 notable is the fact that Plaintiff appeared to recognize in her letter that ultimate decisions

REPORT AND RECOMMENDATION
PAGE - 18

1  regarding transfers are made by officials at DOC headquarters, and not by institution staff. (*See*

2  *id.*) In addition, Defendant O'Connor makes clear that though she was aware of the letter, she did

3  not perceive it as a complaint as it made no mention of her, it merely explained Plaintiff's

4  concerns about moving to AHCC. (*See* O'Connor Decl. at ¶ 8.)

5         While it may be reasonable to construe Plaintiff's letter objecting to the recommended

6  AHCC transfer as a complaint, it cannot reasonably be construed as a complaint *against*

7  Defendant O'Connor. Likewise, any OCO complaint that merely replicated the objections set

8  forth by Plaintiff in her letter cannot reasonably be construed as a complaint *against* Defendant

9  O'Connor. Plaintiff has come forward with no evidence demonstrating that she at any point

10  made a complaint about Defendant O'Connor's conduct in relation to the October 14, 2021

11  FRMT meeting/decision. Moreover, Plaintiff offers no plausible explanation for why a letter

12  expressing her concerns about her transfer to another facility would provoke a retaliatory

13  response from Defendant, particularly in light of the fact that Defendant did not make the

14  decision in question. There is simply no evidentiary support for Plaintiff's claim that her efforts

15  to challenge her transfer to AHCC was the "substantial or motivating factor" behind Defendant

16  O'Connor's alleged adverse actions.

17         Plaintiff attempts to provide support for her retaliation claim through her representations

18  regarding a conversation she claims to have had with Captain Ina McNeese in December 2021

19  during which, according to Plaintiff, Captain McNeese told her she had heard Defendant

20  O'Connor was angry with Plaintiff. (*See* Pl.'s Decl. at ¶ 16.) As described above, Plaintiff

21  alleged in discovery that when she asked Captain McNeese why Defendant O'Connor was angry

22  with her, Captain McNeese replied that it "had something to do with a transfer, and how you've

23  been interacting with the wild rabbits in the yard." (*See* First Williams Decl., Ex. 2 at 5.) While

REPORT AND RECOMMENDATION
PAGE - 19

these details might arguably serve to bolster Plaintiff's retaliation claim, Captain McNeese denies that the conversation described by Plaintiff actually occurred. (McNeese Decl. at ¶ 4.) And, as Defendant correctly argues, Plaintiff's claim about what Captain McNeese said is not evidence, it is hearsay under Fed. R. Evid. 801 and, in accordance with Fed. R. Civ. P. 56(c), it is not admissible here because the hearsay issue could not be cured at trial given that Captain McNeese denies Plaintiff's assertions are true. (Def.'s Mot. 17-18; Def.'s Reply at 10-11.)

Plaintiff has not offered any argument or admissible evidence demonstrating that Defendant O'Connor took any adverse actions against her based on her protected conduct. Accordingly, Defendant O'Conner is entitled to summary judgment with respect to Plaintiff's retaliation claim.

### 3. Due Process

Plaintiff alleges in the third count of her TAC that her due process rights under the Fourteenth Amendment were violated when she was confined in solitary confinement for "nearly a year" based on false allegations that her life was in danger and that she needed to either be kept in isolation or transferred out of state for her own protection. (*See* TAC at ¶ 41.) Plaintiff asserts that she had a liberty interest in being free from long-term isolation where she was locked down 23 hours a day in a cell by herself and had no ability to obtain review or release from these conditions of confinement, and that this confinement constituted an "atypical and significant hardship as compared with the ordinary incidents of prison life." (*See id.*)

The Due Process Clause protects prisoners from being deprived of life, liberty, or property without due process of law. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974) (citations omitted). However, a due process claim under the Fourteenth Amendment can only be maintained where there exists a constitutionally cognizable liberty or property interest with

1   which the state has interfered. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569

2   (1972). The Supreme Court has held that prisoners have "no liberty interest in freedom from

3   state action taken within the sentence imposed," unless such action imposes an "atypical and

4   significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v.*

5   *Conner*, 515 U.S. 472, 484 (1995). "If the hardship is sufficiently significant, then the court must

6   determine whether the procedures used to deprive that liberty satisfied due process." *Ramirez v.*

7   *Galaza*, 334 F.3d 850, 86-61 (9th Cir. 2003) (citing *Sandin*, 515 U.S. at 484).

8       When a prisoner is placed in administrative segregation, due process requires that prison

9   officials conduct an informal, non-adversary review of the evidence justifying the placement

10  within a reasonable amount of time following the placement. *See Hewitt v. Helms*, 459 U.S. 460,

11  476 (1983), *abrogated in part on other grounds by Sandin*, 515 U.S. 472; *Toussaint v.*

12  *McCarthy*, 801 F.2d 1080, 1100, *abrogated in part on other grounds by Sandin*, 515 U.S. 472.

13  More specifically, prison officials must inform the incarcerated individual of the reasons for the

14  placement and must allow the individual to present her views to the official charged with making

15  the decision regarding the placement. *See id*. Following the initial placement in administrative

16  segregation, prison officials must periodically review the placement. *Hewitt*, 459 U.S. at 477 n.

17  9; *Toussaint*, 801 F.2d at 1101.

18      Defendant argues that Plaintiff's due process claim fails for lack of personal participation

19  on her part. (Def.'s Mot. at 23.) Defendant avers that evidence in the record demonstrates she

20  participated only in the initial placement of Plaintiff in segregation and not in subsequent

21  decisions to continue the placement. (*Id.* at 22.) Defendant maintains that since Plaintiff was

22  provided an informal review within a reasonable time after her placement in administrative

23

1    segregation, and Defendant did not participate in subsequent reviews, she cannot be held liable

2    for what occurred during those meetings. (*See id.*)

3          Plaintiff argues in response that since the allegation that led to her infraction and her stay

4    in solitary confinement was knowingly false and fabricated, her due process rights were violated

5    as a matter of law.[5] (Resp. at 13.) Plaintiff further argues that her ten-month placement in

6    solitary confinement derived entirely from Defendant O'Connor's false charge that Plaintiff had

7    committed animal abuse and her unsubstantiated claims that Plaintiff's life was in danger

8    because of those allegations. (*Id.* at 16-17.) Plaintiff maintains as well that there are no credible

9    reports of any threats and that the only means of other inmates learning of the false and

10   fabricated allegations of animal abuse "is their dissemination by the administration itself because

11   no inmate witnessed anything untoward involving the rabbit at any time on May 17, 2022." (*Id.*

12   at 17.)

13         The evidence demonstrates that Defendant O'Connor authorized Plaintiff's initial

14   placement in administrative segregation on May 17, 2022, pending investigation into the

15   allegation of animal cruelty and a related allegation of Plaintiff refusing directives. (*See*

16   O'Connor Decl. at ¶ 15, Ex. 8 at 1.) On May 19, 2022, an administrative segregation hearing

17   officer conducted an initial placement review, and it was decided Plaintiff would be maintained

18   on administrative segregation at that time. (*Id.*, Ex. 8 at 3.) Defendant O'Connor completed her

19   segregation investigation on May 23, 2022, and determined as a part of her investigation that

20   there were safety concerns should Plaintiff be returned to the general population given notoriety

21

22     [5] In her response to Defendant's argument pertaining to the due process claim Plaintiff alleged in her
     TAC, Plaintiff inserted a new claim alleging that she was denied due process in the infraction hearing

23   itself. (*See* Pl.'s Resp. at 14-15.) However, Plaintiff alleged no such claim in her TAC, and the Court will
     not entertain Plaintiff's procedural due process argument as the claim was not properly pled in the first
     instance.

1 surrounding the rabbit incident. (*Id.*, Ex. 8 at 2-3.) Plaintiff's segregation placement was

2 thereafter extended twice, but neither decision involved Defendant O'Connor. (*See* O'Connor

3 Decl., Ex. 8 at 2-3.)

4       While Plaintiff was housed in administrative segregation, an FRMT was convened, and it

5 was recommended that Plaintiff be demoted to maximum custody due to protection concerns and

6 a lack of placement options. (O'Connor Decl., Ex. 10 at 5-6.) DOC headquarters subsequently

7 approved out-of-state placement for Plaintiff due to investigative information reports that there

8 was an elevated threat posed toward Plaintiff on a statewide level. (*Id.*, Ex. 10 at 7.) Defendant

9 O'Connor was not involved in the FRMT nor in the decision to approve an out-of-state

10 placement. (*See id.*, Ex. 10.)

11       Plaintiff suggests there would have been no safety concerns had Defendant O'Connor not

12 written an allegedly false infraction against Plaintiff regarding the rabbit incident in the first

13 instance and "disseminated that falsehood to the inmate population." (*See* Pl.'s Resp. at 7, 17.)

14 Notably, however, the prohibited placement request submitted at around the same time as

15 Defendant O'Connor's infraction makes clear that safety concerns regarding Plaintiff's

16 placement were not limited to the alleged rabbit incident. (*See* O'Connor Decl., Ex. 9.) The MCC

17 Intelligence and Investigations Unit investigator who reviewed the prohibited placement request

18 made the following comments/recommendation:

19         Due to previous placements at BAR, ITP, AHCC, and TRU it appears I/I
    Sutton has safety concerns. Active separations at CBCC-D unit (quad), TRU-C

20     (facility), TRU-B (unit), AHCC-T (unit), WCC-TC (unit) his placement options are
    limited. MCC-IIU recommends retain on Max custody due to new safety concerns

21     surrounding this incident. Max com[mittee] should determine appropriate housing.

22 (O'Connor Decl., Ex. 9 at 4.)

23

REPORT AND RECOMMENDATION
PAGE - 23

Decisions with respect to how to manage the various safety concerns related to Plaintiff were not within the purview of Defendant O'Connor and, indeed, as of June 1, 2022, when Defendant moved from MCC-WSR to MCC-TRU, she was no longer responsible for any aspect of Plaintiff's confinement. (*See* O'Connor Decl. at ¶ 15.) To the extent Plaintiff claims that Defendant O'Connor created a safety concern by disseminating false information regarding the rabbit incident to the inmate population, Plaintiff's claim is based solely on conjecture and is not supported by the record evidence.

In addition, the evidence demonstrates that the incident itself, not the subsequent infraction, triggered the concerns for Plaintiff's safety at MCC-WSR that resulted in her lengthy period in solitary confinement. The sanction imposed for the infraction included 30 days cell confinement, among other sanctions, but it did not include any time in segregation. (*See* Second Williams Decl., Ex. 1, Attach H.) At the time of the incident, Officer Balyeat made a notification over the institutional radio to the effect that there were two inmates in the yard "molesting" a rabbit and that staff needed to "cell in" both Plaintiff and inmate Eren. (*See* Balyeat Decl. at ¶ 7, Ex. 1). Regardless of what Officer Balyeat may have intended in using the word "molesting" to describe Plaintiff's behavior toward the rabbit, it cannot be denied that the word carries with it connotations of abuse.

Defendant O'Connor explains that the radio notification could be heard by both staff and other inmates who were near officers receiving the call, and that the radios transmit throughout the facility so there were concerns about what other inmates might do in response to Plaintiff's behavior. (*See* O'Connor Decl. at ¶ 17.) Defendant O'Connor further explains that she received reports from staff at the time that inmates, including Plaintiff, Mr. Eren, and others who resided in the same living unit, were speaking a lot about the situation after it occurred and expressing

REPORT AND RECOMMENDATION
PAGE - 24

their anger towards the situation. (*Id*.) These facts demonstrate that the safety concerns emanated from the incident itself and not from the infraction which was not submitted until almost a week after the incident occurred. (*See id.*, Ex. 4.)

Plaintiff has not offered any argument or evidence demonstrating that Defendant O'Connor was involved in the decisions that resulted in Plaintiff's long-term incarceration in solitary confinement, or that she personally participated in any way in the violation of Plaintiff's due process rights. Accordingly, Defendant O'Conner is entitled to summary judgment with respect to Plaintiff's due process claim.

### 4.    *Defendant's Motion to Strike*

Defendant, in her reply to Plaintiff's response to her summary judgment motion, moves to strike portions of the declarations and related exhibits of Plaintiff and her counsel, Darryl Parker. (*See* Reply at 10-13.) Defendant's list of objectionable material is lengthy. The Court, in ruling on Defendant's summary judgment motion, has included references to some of the materials included on Defendant's list of objectionable materials to provide context for its discussion of Plaintiff's claims. The Court also discussed in some detail above the objectionable material pertaining to Captain Ina McNeese. However, the Court has not relied on any of the objectionable material to resolve substantive issues in ruling on Defendant's summary judgment motion. The Court therefore sees no need to address in detail Defendant's specific objections, other than the one noted above, or to comb through the declarations looking for objectionable content to strike.

//

//

//

REPORT AND RECOMMENDATION
PAGE - 25

## IV.    CONCLUSION

Based on the foregoing, this Court recommends that Defendant's motion for summary judgment (dkt. # 59-2) be granted, and that Plaintiff's third amended complaint (dkt. # 40) and this action be dismissed with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit not later than **fourteen (14) days** from the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar **fourteen (14) days** from the date they are filed. Responses to objections may be filed by **the day before the noting date**. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **September 24, 2024**.

DATED this 9th day of September, 2024.

_____
MICHELLE L. PETERSON
United States Magistrate Judge

REPORT AND RECOMMENDATION
PAGE - 26